# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BAYHEALTH MEDICAL CENTER, | : | |
| | : | C.A. No. K15A-09-007 WLW |
| Employer/Appellant, | : | Kent County |
| | : | |
| v. | : | |
| | : | |
| LORRAINE LOPER, | : | |
| | : | |
| Employee/Appellee. | : | |

Submitted: April 11, 2016
Decided: June 22, 2016

## ORDER

Upon an Appeal from the Decision of the
Industrial Accident Board.
*Affirmed.*

Keri L. Morris-Johnston, Esquire of Marshall Dennehey Warner Coleman & Goggin, Wilmington, Delaware; attorney for the Employer/Appellant.

Kyle F. Dunkle, Esquire of Schmittinger & Rodriguez, P.A., Dover, Delaware; attorney for the Employee/Appellee.

WITHAM, R.J.

Before the Court is Appellant/Employer Bayhealth Medical Center's ("Bayhealth") appeal from a decision of the Industrial Accident Board ("IAB" or "Board") denying Bayhealth's Petition for Review seeking to terminate disability benefits. After a hearing on Bayhealth's Petition, the Board concluded that Appellant/Claimant Lorraine Loper ("Loper") remained totally disabled, and that even if Loper was physically capable of returning to work, she was a displaced worker. The Court is asked to determine whether: (1) the Board properly applied the law in determining that Loper was totally disabled; (2) substantial evidence was presented to support the Board's finding that Loper was totally disabled; (3) the Board properly applied the law in determining that Loper was a displaced worker; and (4) there was substantial evidence to support the Board's finding that Loper was a displaced worker. For the reasons set forth below, the Court determines that the Board's decision contained no legal errors and was supported by substantial evidence. Therefore, the decision of the Board is AFFIRMED.

## FACTUAL AND PROCEDURAL BACKGROUND

In January 2007, Loper suffered a compensable lower back injury while employed by Bayhealth as a housekeeper. In October 2007, she began receiving total disability benefits. Loper underwent two lumbar spine surgeries as a result of the accident. The surgeries were performed by Dr. Ali Kalamchi. The first surgery, an L4-5 fusion and instrumentation, was performed in September 2008. Loper reported improvement, but one year after the surgery, an MRI showed an annular tear and broad bulge at the L5-S1. The second surgery, an L5-S1 posterior fusion and

2

instrumentation, was performed on October 29, 2014. In December 2014, after the soft tissue had been allowed to heal, Loper was examined by Dr. Kalamchi as part of a post-operative follow-up. Based on the results of the examination, Dr. Kalamchi considered Loper incapable of returning to work and ordered water-based therapy as part of Loper's post-operative rehabilitation.

On January 7, 2015, Loper was seen by Dr. Stephen Fedder at the request of Bayhealth for an independent medical examination. Dr. Fedder stated that Loper was capable of returning to work in a sedentary or light duty position on a full-time basis if given the opportunity to change her body position every thirty minutes on average.

On February 12, 2015, Bayhealth filed a Petition for Review alleging that Loper was no longer totally disabled and was physically able to return to work. Loper disputed the claim and alleged that she remained totally disabled, or in the alternative was a displaced worker. The Board scheduled a hearing on Bayhealth's petition for June 29, 2015.

*Dr. Kalamchi's Deposition*[1]

Dr. Kalamchi was deposed on May 29, 2015, and, after providing background on Loper's treatment prior to the second surgery, testified regarding the second back surgery and postoperative treatment. Loper returned to Dr. Kalamchi in September 2014 complaining that her back pain had not improved with conservative treatment. In October 2014, Dr. Kalamchi performed the second back surgery. A post-surgical

---

[1] Dep. of Dr. Kalamchi, Record of *Loper v. Bayhealth Med. Ctr.*, No. 1297776, at 10 (Del. I.A.B. Aug. 20, 2015), Tab 5.

3

note from November 2014 indicated that Loper had shown improvement after the surgery. Dr. Kalamchi normally waits six weeks before starting water-based therapy[2] and three months before starting land-based therapy.

Loper's first post-surgical visit with Dr. Kalamchi was at the six week point in December 2014. Dr. Kalamchi noted that Loper was doing very well and that he was pleased with her progress. Loper was to start water-based therapy, and was to set a date when she could return to discuss land-based therapy. Dr. Kalamchi did not yet believe that Loper was able or capable of returning to work.

Loper returned to Dr. Kalamchi on March 11, 2015. By this date, Loper was participating in water-based therapy. Dr. Kalamchi found Loper to be "improved and active; have pain after sitting; be guarding her forward flexation to about fifty degrees and able to reach her knees; have good ranges of lateral bending and rotation; have negative straight leg raise test results; and have no looseness or muscle fatigue."[3] Loper also reported that she was seeing benefits from the water-based therapy. Dr. Kalamchi's plan was to progress Loper to land-based therapy when she was ready, but noted that she was not ready for land-based therapy at that point. Dr. Kalamchi recommended a no-work note and instructed Loper to continue physical therapy with

---

[2] Dr. Kalamchi explained that water-based therapy refers to water exercises. These exercises reduce inflammation, spasms, and tightness. They also help improve range of motion and cut down on atrophy after the surgery. Dr. Kalamchi noted that water eliminates some of the gravity, so it reduces the stress on the fusion. Thus, the patient can do more exercises in the water without putting too much stress on the fusion issue and without interfering with the progression of the bony fusion.

[3] *Loper v. Bayhealth Med. Ctr.*, No. 1297776, at 10 (Del. I.A.B. Aug. 20, 2015) (corrected decision) [hereinafter *Loper Corrected Decision*].

4

the goal of transitioning from water-based therapy to land-based therapy. Loper was next scheduled to see Dr. Kalamchi in mid-June 2015.

When asked if Dr. Fedder's recommendation to return Loper to sedentary or light-duty work on a full-time basis was appropriate, Dr. Kalamchi replied:

> Well, I think it's too early, but even if the patient is able to do work, able means trained to do that position or so, regardless, physically she probably can do a sedentary job, but I doubt if she's going to be able to do it full-time immediately. . . . Personally, I would start them on part-time and build them up to the position they have.[4]

When asked if he would recommend a work hardening program for Loper, Dr. Kalamchi stated:

> I think the work hardening, once she finishes the regular therapy program, and then if she is going to move let's say from sedentary to light or light up or more increase some of the activities, then you probably have to talk about work hardening program to accommodate whatever position she's going to have. But they have to finish their routine fusion therapy program, which she has not finished. I guess by the time she comes she should have finished the land exercises on her next appointment. We'll check on that.[5]

On cross examination, when asked to confirm that he had maintained Loper's total disability status, Dr. Kalamchi replied:

> Well, the only reason we did -- and again, we can always talk about that -- the only reason we did is just (a) she's not worked for a long time; (b) she doesn't have a job; and (c) she hasn't done the land exercises. So

---

[4] Dep. of Dr. Kalamchi, *supra* note 1, at 25-26.

[5] *Id.* at 26.

these are the restrictions I had in not letting her go back to work or discuss any work status. But, I certainly talked to her about it.[6]

Dr. Kalamchi confirmed that he told Loper they needed to think about going back to work; "doing work hardening and then talk about going back to work soon."[7] Counsel for Bayhealth then attempted to confirm that Dr. Kalamchi had stated he believed Loper was physically able to do sedentary work in a part-time capacity, to which Dr. Kalamchi responded "I think in general I said she can do -- start with part-time sedentary work and advance her as she progresses."[8] When asked if he would be able to reduce Loper's restrictions in June based on how she was doing, Dr. Kalamchi replied "most likely."[9]

When asked why he did not believe full-time work was appropriate, Dr. Kalamchi explained that when a patient is recovering from surgery and has not worked in a long time, the patient needs to adjust their lifestyle and manage the job. Dr. Kalamchi stated "I personally will start them -- and we're talking now under the three months, I will start them more part-time and build them up."[10] When counsel for Bayhealth pointed out that they were then seven months from the surgical procedure, Dr. Kalamchi stated "But, ma'am, you are referring me to the letter of the DMA person which was done under the three months. I'm just talking in general.

---

[6] *Id.* at 34-35.

[7] *Id.* at 35.

[8] *Id.* at 36.

[9] *Id.*

[10] Dep. of Dr. Kalamchi, *supra* note 1, at 37.

Now I can -- now I am very comfortable I can tell her to go back. But the part-time will be more an issue of training than a physical issue."[11]

*Dr. Fedder's Deposition*[12]

On January 7, 2015, at the request of Bayhealth, Dr. Fedder conducted an examination of Loper. Dr. Fedder noted that Loper had not been off of narcotics since the accident. Dr. Fedder observed that Loper was able to walk heal to toe, rise up on her toes and heels, and was able to rise on a bended knee on both sides. He found that Loper did not have muscle atrophy, but rather had superior bulk and strength in the lower extremities. Dr. Fedder also noted that Loper had even wear on her shoes and elaborately decorated nails and toenails that were uncracked. The even wear and uncracked nails were relevant because Loper was describing patchy sensory loss, and people with patchy sensory loss generally have problems with their skin and do not walk in a symmetrical manner and would not be expected to maintain the integrity of an intact and elaborate pedicure.

Dr. Fedder also found Loper to have an intact mental status and intact higher intellectual function which he found significant in a person who takes Percocet and Flexeril. Loper reported that she took Percocet every four to six hours and went to sleep after each dose. Dr. Fedder found the claim of taking Percocet every four to six hours and falling asleep after each dose to be inconsistent with Loper's intact mental status and superior physical conditioning in the lower extremities. Dr. Fedder opined

---

[11] *Id.*

[12] Dep. of Dr. Fedder, Record of *Loper*, I.A.B. No. 1297776, Tab 6.

7

that the intact mental status and physical condition of her lower extremities meant she was doing significant exercises or working out, which was inconsistent with Loper's claim of sleeping after each dose of Percocet. Although Dr. Fedder agreed that gradual transition to the workplace was warranted when the patient has been out of work for a long period of time, he testified that in Loper's case, because of her superior conditioning in her lower extremities, no transition was warranted.

*Testimony of Ellen Lock*[13]

At the Board hearing on June 29, 2015, Bayhealth presented the testimony of Ellen Lock ("Lock"), a vocational case manager. Lock prepared a labor market survey report using information from Loper's previous employment history as well as Dr. Fedder's report stating that Loper could perform full-time sedentary to light-duty work. Lock identified nine jobs that she believed were compatible with Loper's age, education, geographic residence, work history, and vocational training. Lock testified that sedentary work is predominantly sitting with the occasional need to lift up to ten pounds, and light-duty consists of some standing and some sitting with the occasional need to lift up to twenty pounds.

Lock spoke with the manager or person in charge of hiring at all nine companies on the survey. She inquired into the job requirements and essential job duties. Lock also asked whether the applicant would be required to lift more than ten or twenty pounds and whether they could change position or take breaks as needed. She testified that she avoided words such as sedentary or light-duty because most

---

[13] Hr'g Tr. at 64, Record of *Loper*, I.A.B. No. 1297776, Tab 2.

employers are not aware of what those restrictions actually entail. Lock then provided a detailed description of each job listed on the survey. Although all nine positions were available when the report was written, only four of those positions were available on the day of the hearing. The four available positions were with Dover Behavioral Health, Goodwill, Bob Evans Restaurant, and Dover Downs. Lock noted that the job market is competitive, and that employers can expect to choose from several candidates for one job opening. Lock also noted that jobs such as those listed in the survey come and go but they are representative of jobs available in the community, and that Loper would be a competitive candidate for such jobs.

*Testimony of Lorraine Loper*[14]

Loper testified that she is fifty-one years old, has a tenth grade education, no GED and no computer skills. She has worked since she was fourteen years old in jobs such as housekeeping, teacher's aide, clerical work, and was once a supervisor at Proctor & Gamble.

Loper currently takes Percocet, muscle relaxers, and Ibuprofen 800. She testified that the medications lighten the pain that she deals with on a daily basis. She states the pain is at a level of eight or nine out of ten when she first wakes up in the morning, but the pain drops to a level of three out of ten after taking Percocet. She can perform some activities around the house such as showering and cooking her own meals. Her granddaughter helps with cleaning the house. Loper states that she can walk, but not for a distance, and she is not exercising outside of therapy.

---

[14] *Id.* at 20.

9

Loper testified that she understood she was cleared to work in a light-duty job that would require no pulling, lifting, or bending. Loper had been looking for jobs since June 22, 2015. She believed the restrictions for light-duty to be not sitting for a long period of time, not bending, and not lifting. She testified that she believed this to be so because she had a paper with the restrictions listed. The paper was the labor market survey prepared by Lock. Loper had no documentation from a medical provider listing these restrictions.

Loper contacted all nine firms listed on the labor market survey, explained her work restrictions, and inquired into possible job openings; however, she was unsuccessful in securing employment. When she contacted Dover Downs, she was told there were no light duty positions, but she could apply online. Loper did apply online, but had not received a response as of the date of the hearing. When she contacted Brunswick Bowling in person, she was told that there would not be any light duty positions until Fall 2015. When she contacted Bob Evans by telephone, she was told that there were no openings for a greeter or cashier position, but she could apply online. She was also told by Carmike Cinema and Capitol Cleaners that there were no light duty positions available. She was told by Goodwill that she would need to lift fifty pounds in order to be hired for the back door position. Check 'n Go and Redner's gas station informed her that the positions on the labor market survey were no longer available. She was told by Dover Behavioral Health that she must apply online, which she did, but had not received a response as of the date of the hearing. Loper testified that none of the jobs for which she applied would hire her

10

because of her work restrictions.

## *The Board's Decision*[15]

On July 10, 2015, the Board issued its decision on Bayhealth's petition. On the question of whether Loper was physically capable of working, the board noted that Dr. Kalamchi had kept Loper on total disability status at least until she completed her land-based therapy. The Board held that Loper's total disability status would continue until she completed her land-based therapy and was able to reenter the workforce gradually as recommended by Dr. Kalamchi. On the question of whether Loper was a displaced worker, the Board noted that Loper's unsuccessful efforts to obtain work were evidence of her actual displacement, and thus a separate basis for finding her totally disabled even if she was capable of returning to work. For these reasons, the Board held that Loper remained totally disabled.

On July 24, 2015, Bayhealth filed a motion for reargument. In addition to seeking corrections to the Boards decision dated July 10, 2015,[16] Bayhealth argued that both parties had advised the Board that there was no dispute regarding the medical testimony and that Loper was medically able to return to work. The Board granted the request for corrections, but denied reargument. The stipulation of facts listed one of the remaining issues as "what are the Claimant's current work

---

[15] *Loper Corrected Decision.*

[16] The July 10, 2015 decision stated that disability benefits had been paid from the Worker's Compensation fund since November 27, 2014. Bayhealth is a self-insured employer and continued to pay disability benefits to Loper pending a hearing and decision. The decision also stated that the hearing date was April 16, 2015. The actual hearing date was June 29, 2015. These corrections were reflected in the corrected decision issued on August 20, 2015.

11

capabilities?" The Board noted that Dr. Kalamchi disagreed with Dr. Fedder's recommendation that Loper return to work in a light-duty capacity on a full-time basis. Dr. Kalamchi "testified that is was 'too early' for Loper to return to work on a full time basis and that she should begin a work hardening program . . . . But they have to finish their routine fusion therapy program, which she has not finished."[17] The Board found that while counsel averred to a lack of dispute over the expert's findings, neither the Stipulation nor the evidence reflected an agreement as to Loper's return to work status. On August 20, 2015, a corrected decision was issued by the Board. On September 23, 2015, Bayhealth appealed the Board's decision to this Court.

## STANDARD OF REVIEW

We review an Industrial Accident Board decision for legal errors and to determine whether the decision is supported by substantial evidence.[18] Where the issue raised involves only a question of proper application of the law, our review is *de novo*.[19] "Absent an error of law, the standard of review for a Board's decision is abuse of discretion."[20] When the issue raised involves abuse of discretion, we will

---

[17] Order on Mot. for Reargument, at 2 (citing Dep. of Dr. Kalamchi, *supra* note 2, at 25-26) (emphasis removed).

[18] *Conagra/Pilgrim's Pride, Inc. v. Green*, 954 A.2d 909 (Del. 2008) (citing *Le Van v. Independence Mall, Inc.*, 940 A.2d 929, 931-32 (Del. 2007)).

[19] *Vincent v. E. Shore Markets*, 970 A.2d 160, 163 (Del. 2009) (citing *Baughan v. Wal-Mart Stores*, 2008 WL 1930576, at *2 (Del. May 2, 2008)).

[20] *Boone v. Syab Servs./Capitol Nursing*, 2013 WL 3777153, at *1 (Del. July 16, 2013) (citing *Person-Gaines v. Pepco Holdings, Inc.*, 981 A.2d 1159, 1161 (Del. 2009)).

determine "whether substantial evidence exists to support the Board's findings of fact and conclusions of law."[21] Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion.[22] This Court does not weigh the evidence, determine questions of credibility or make its own factual findings,[23] and will find "the Board has abused its discretion only when its decision has 'exceeded the bounds of reason in view of the circumstances.'"[24]

## DISCUSSION

Upon filing a petition to terminate benefits, the employer "bears the initial burden of demonstrating that the employee is no longer totally incapacitated for the purpose of working."[25] If this burden is satisfied, the Claimant must then show that she is a "displaced worker."[26] "A worker is displaced if she 'is so handicapped by a compensable injury that [s]he will no longer be employed regularly in any well known branch of the competitive labor market and will require a specially-created job if [s]he is to be steadily employed.'"[27] Factors such as the Claimant's physical

---

[21] *Boone*, 2013 WL 3777153, at *1 (citing *Person-Gaines*, 981 A.2d at 1161).

[22] *Person-Gaines*, 981 A.2d at 1161 (quoting *Olney v. Cooch*, 425 A.2d 610, 614 (Del. 1981)).

[23] *Bullock v. K-Mart Corp.*, 1995 WL 339025, at *2 (Del. Super. May 5, 1995) (citing *Johnson v. Chrysler Corp.*, 213 A.2d 64, 66-67 (Del. 1965)).

[24] *Stanley v. Kraft Foods, Inc.*, 2008 WL 2410212, at *2 (Del. Super. Mar. 24, 2008) (quoting *Willis v. Plastic Materials Co.*, 2003 WL 164292, *1 (Del. Super. Jan. 13, 2003)).

[25] *Torres v. Allen Family Foods*, 672 A.2d 26, 30 (Del. 1995) (citing *Gov. Bacon Health Ctr. v. Noll*, 315 A.2d 601, 603 (Del. Super. 1974).

[26] *Id.*

[27] *Id.* (quoting *Ham v. Chrysler Corp.*, 231 A.2d 258, 261 (Del. Super. 1967).

13

impairment, mental capacity, education, training, and age may constitute a prima facie showing of displacement.[28] "However, even if there is insufficient evidence for the [Claimant] to show that she is prima facie displaced, she is a displaced worker and deemed 'totally disabled' for the purposes of the Delaware Workers' Compensation Law . . . if she 'has made reasonable efforts to secure suitable employment which have been unsuccessful because of the injury.'"[29] If the Claimant is successful in demonstrating displacement, the burden shifts back to the employer to show that work within the employee's capabilities is available.[30]

*The Board's Finding that Loper was Totally Disabled was Properly Decided Under the Law and Supported by Substantial Evidence*

A claimant's disability need not render him utterly helpless in order to qualify as a "total disability."[31] The term total disability "means such disability that the employee is unable to perform any services 'other than those which are so limited in quality, dependability, or quantity that a reasonably stable market for them does not exist.'"[32] "It has been well stated that the essence of the test of total disability is 'the probable dependability with which claimant can sell his services in a competitive labor market, undistorted by such factors as business booms, sympathy of a particular

---

[28] *Id.*

[29] *Id.* (quoting *Franklin Fabricators v. Irwin*, 306 A.2d 734, 737 (Del. Super. 1973)).

[30] *Id.*

[31] *M.A. Hartnett, Inc. v. Coleman*, 226 A.2d 910, 913 (Del. 1967).

[32] *M.A. Hartnett, Inc.*, 226 A.2d at 913 (quoting *Lee v. Minneapolis Street Railway Co.*, 41 N.W.2d 433, 436 (Minn. 1950).

14

employer or friends, temporary good luck, or the superhuman efforts of the claimant to rise above his crippling handicaps.'"[33] When considering the severity of a disability under a petition to terminate benefits, "it is the exclusive function of the Board to evaluate the credibility of the evidence and accept the testimony (and records) of one physician over the other."[34] However, when such testimony is presented to the Board via deposition, the Board "is not permitted to accept one opinion over the other *solely on the persuasiveness* of that witness."[35] Simply stated, "it is the Board's function to resolve conflicts in medical testimony."[36]

In denying Bayhealth's petition to terminate benefits, the Board quoted *Torres v. Allen Family Foods* when it stated that "the initial burden is on the employer to show 'that the employee is no longer totally incapacitated *for the purpose of working*.'"[37] The emphasis on "for the purpose of working" was added by the Board. It is Bayhealth's opinion that the Board placed undue weight on the emphasized portion of the quote. Bayhealth argues this undue weight resulted in a misapplication of the law and required them to show something more than the claimant's physical ability to return to work in order to meet its initial burden of proof. Bayhealth claims

---

[33] *Id.* (quoting 2 *Larson's Workmen's Compensation Law*, §§ 57.00, 57.51).

[34] *Sudler v. Univ. of Del.*, 1993 WL 189474, at *5 (Del. Super. May 5, 1993) (citing *Vasquez v. Abex Corp.*, 1992 WL 397454, at *1 (Del. Nov. 5, 1992) (TABLE)).

[35] *Rhinehardt-Meredith v. State*, 963 A.2d 139 (Del. 2008) (citing *Lindsay v. Chrysler Corp.*, 1994 WL 750345, at *3 (Del. Super. Dec. 7, 1994)).

[36] *Stratton v. Bayhealth Med. Ctr.*, 2005 WL 2841608, at *3 (Del. Super. Oct. 25, 2005).

[37] *Loper Corrected Decision*, at 11 (quoting *Torres*, 672 A.2d at 30).

15

the proper question is whether Loper is physically capable of working.

Bayhealth believes they met the initial burden because, as the Board acknowledged, "Dr. Kalamchi reported that he had reviewed Dr. Fedder's report and that he believes it is too early for Claimant to perform light duty work, *but physically she could do a sedentary job*, but not on a full-time basis."[38] Although Bayhealth is correct in stating that the employer's burden is to show the Claimant's ability to return to work, this burden requires something more than showing the Claimant has the ability to darken an employer's doorway. To be considered totally disabled, Loper is not required to show utter helplessness, nor is she required to expend superhuman efforts to rise above her crippling handicaps. Although Dr. Kalamchi stated that he thought Loper could do sedentary work, that statement must be taken in context.

Loper's last visit to Dr. Kalamchi prior to the Board hearing took place on March 11, 2015. As of that date, Loper had yet to transition to land-based therapy and was still taking pain medication for pain that reached a level of eight or nine out of ten.[39] Dr. Kalamchi planned to progress Loper to land-based therapy when she was ready, but noted she was not ready as of March 11, 2015. Dr. Kalamchi continued the no work restriction and asked Loper to schedule another appointment in three months.

When asked whether he agreed with Dr. Fedder's report recommending

---

[38] *Id.* at 10 (emphasis added).

[39] As of the date of the Board hearing on June 29, 2015, Loper was still taking Percocet, muscle relaxers, and ibuprofen 800. Hr'g Tr. at 24.

16

sedentary to light-duty work on a full-time basis, Dr. Kalamchi responded by saying "I think it's too early, . . . physically she *probably* can do a sedentary job, but I doubt if she's going to be able to do it full-time immediately."[40] When asked if he would recommend a work hardening program, Dr. Kalamchi replied that he would, but qualified his answer by stating "[b]ut they have to finish their routine fusion therapy program, which she has not finished."[41] Dr. Kalamchi assumed Loper would finish her land-based therapy program before her next visit, but noted he would have to "check on that."

On cross examination, Dr. Kalamchi confirmed he had maintained Loper's total disability status. One of the reasons given for maintaining this status was that Loper "hasn't done the land exercises." When asked to confirm that he had said Loper was "physically able to do sedentary work in a part-time capacity," Dr. Kalamchi replied "I think *in general* I said she can do -- start with part-time sedentary work and advance her as she progresses."[42] Dr. Kalamchi followed this statement by saying "[t]hat was earlier on. I mean, at this stage I will let her go to sedentary or so. If she comes in in June, between sedentary and light-duty, *depending on her progress*."[43] Dr. Kalamchi's statements regarding Loper's ability to do sedentary work were generalities and were made without the benefit of an examination subsequent to his

---

[40] Dep. of Dr. Kalamchi, *supra* note 1, at 25 (emphasis added).

[41] *Id.* at 26.

[42] *Id.* at 36 (emphasis added).

[43] *Id.*

order not to work.

In their motion for reargument, Bayhealth argued that there was no dispute regarding the medical testimony and that Loper was medically able to return to work. The Board found that neither a joint stipulation[44] submitted by the parties nor the evidence reflected an agreement regarding Loper's return to work status. In its order denying reargument, the Board noted that "while counsel averred to a lack of dispute over the expert's findings, neither the Stipulation nor the evidence reflects an agreement as to Claimant's return to work status."[45] Bayhealth relies on statements made by Dr. Kalamchi at a deposition taken after Loper was placed on a no-work order and before she had her subsequent appointment. Dr. Kalamchi's testimony that Loper could perform sedentary or light-duty work appears to be general in nature. It is unlikely that a physician would rescind a no-work order without performing a subsequent examination to ensure progress had been made since the examination precipitating the no-work order.

The Court finds no error of law in the Board's application of the standard for determining whether Loper is able to return to work. Because the Court finds no error of law, the Board's decision not to terminate benefits is subject to an abuse of discretion standard. Loper had yet to complete her land-based therapy, had yet to have a follow-up appointment with Dr. Kalamchi after receiving a no-work order, and

---

[44] The parties submitted a joint stipulation of facts during the hearing. One of the issues listed was "[w]hat are Claimant's current work capabilities." *See* Record of *Loper*, I.A.B. No. 1297776, Tab 3.

[45] Order on Employer's Mot. For Reargument, at 2-3.

was still talking Percocet, muscle relaxers and ibuprofen 800. Dr. Kalamchi's statements regarding Loper's return to work were general in nature. The Board's finding that Loper remains totally disabled was supported by substantial evidence. Therefore, the Court holds the Board's finding that Loper was totally disabled was properly decided under the law and supported by substantial evidence.

*The Board's Finding that Loper was an Actually Displaced Worker was Properly Decided Under the Law and Supported by Substantial Evidence*

In *Ham v. Chrysler Corporation*, the Delaware Supreme Court stated that the "inability to secure work, if causally connected to the injury, is as important a factor as the inability to work."[46] Thus, "[a] workman may be totally disabled economically, and within the meaning of the Workmen's Compensation Law, although only partially disabled physically."[47] Whether a claimant is a displaced worker hinges on whether the claimant has made a good faith effort to seek employment within the restrictions imposed by their injury. For example, in *Franklin Fabricators v. Irwin*, the worker suffered a leg injury that resulted in a 25% permanent loss of use of the left leg.[48] The employee could not work in his previous job as a steel fabricator and erector, but made numerous attempts to find other employment.[49] The employee disclosed his disability and was repeatedly refused employment.[50] The Court found

---

[46] *Ham*, 231 A.2d at 261.

[47] *Id.*

[48] *Franklin Fabricators*, 306 A.2d at 736.

[49] *Id.*

[50] *Id.*

that "the employee's compensable injury left him in the 'displaced' worker category."[51]

In *Torres v. Allen Family Foods*, the claimant was not found to be a displaced worker despite contacting at least twenty employers.[52] The claimant obtained a list of potential employers from her attorney. This list was taken from market surveys used in previous cases.[53] Because the labor market surveys were not current, they "only indicated the availability of a job at sometime in the past."[54] Moreover, the claimant only mentioned her disability in two cover letters, leading the Court to conclude that she could not have been refused employment because of her disability because the potential employer was unaware of the disability.[55] In upholding the Superior Court's affirmation of the Board's decision, the Delaware Supreme Court agreed with the Board's finding that the claimant "could have better demonstrated that she made 'reasonable efforts to secure employment which were unsuccessful because of her injury' if she had contacted employers who actually had openings."[56]

In the case *sub judice*, Loper contacted numerous employers in an attempt to find work that would accommodate her work restrictions. Unlike the claimant in *Torres*, Loper was working from a current job market survey that was supplied by a

---

[51] *Id.*

[52] *Torres*, 672 A.2d at 31.

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Id.*

20

vocational case manager that had been retained by Bayhealth. She made each potential employer aware of her limitations. At each turn she was told either that the job was no longer available or that the employer had no openings for someone with her limitations. Some of the listed employers told her to apply online, but Loper never received a response after submitting the online application. After a reasonable search, Loper was unable to find employment because of her disability.

Bayhealth takes exception to the brevity of the Board's analysis of Loper's displacement. Bayhealth notes that the Board's decision consisted of only 135 words. Bayhealth believes the Board did not address the reasonableness of the job search and failed to analyze whether Bayhealth effectively rebutted Loper's job search with the Labor Market Survey and the testimony of Ellen Lock. Bayhealth's argument is unavailing. The bulk of Lock's testimony centered on the job requirements for the jobs listed in the labor market survey she prepared for Bayhealth. Lock opined that Loper was not a displaced worker, that she was generally employable, and that she was qualified for each of the nine jobs listed in the survey. However, Loper was not able to procure employment with any of the nine companies listed in the survey. In summary, Lock testified that Loper was employable and offered nine examples of companies that had openings and would hire someone with Loper's limitations. None of the companies hired Loper. This does not always require a verbose analysis. The facts surrounding Lock's testimony and Loper's job search were well documented in the opinion's Summary of Evidence and succinctly analyzed in the Findings of Fact and Conclusions of Law. The Board's finding that Loper was an actually displaced

21

worker was properly decided under the law and supported by substantial evidence.

## CONCLUSION

Based on the foregoing, the decision of the Industrial Accident Board is **AFFIRMED**.

IT IS SO ORDERED.

/s/ William L. Witham, Jr.
Resident Judge

WLW/dmh